EXHIBIT-B

NO SUMMONS ISSUED

1   DAVID A. LOWE (SBN: 178811)
    Email: dal@rezlaw.com
2   JOHN T. MULLAN (SBN: 221149)
    Email: jtm@rezlaw.com
3   MICHELLE G. LEE (SBN: 266167)
    Email: mgl@rezlaw.com
4   MEGHAN F. LOISEL (SBN: 291400)
    Email: mfl@rezlaw.com
5   WILLIAM P. McELHINNY (SBN 296259)
    Email: wpm@rezlaw.com
6   RUDY, EXELROD, ZIEFF & LOWE, LLP
    351 California Street, Suite 700
7   San Francisco, CA  94104
    Telephone: (415) 434-9800
8   Facsimile: (415) 434-0513

9   GEORGE A. WARNER (SBN: 320241)
    Email: gwarner@legalaidatwork.org
10  KIMBERLY OUILLETTE (SBN: 326562)
    Email: kouillette@legalaidatwork.org
11  LEGAL AID AT WORK
    180 Montgomery Street, Suite 600
12  San Francisco, CA  94104
    Telephone: (415) 864-8848
13  Facsimile: (415) 593-0096

14  Attorneys for Plaintiffs
    Benjamin Valdez, Hector Castellanos,
15  Worksafe, and Chinese Progressive Association

ENDORSED FILED
SUPERIOR COURT
COUNTY OF SAN FRANCISCO

OCT 22 2020

CLERK OF THE COURT
ANGELICA SUNGA
BY: _____
              Deputy Clerk

16                  SUPERIOR COURT OF CALIFORNIA

17          IN AND FOR THE COUNTY OF SAN FRANCISCO

18

19  BENJAMIN VALDEZ, HECTOR              Case No. CGC-20-587266
    CASTELLANOS, WORKSAFE, AND
20  CHINESE PROGRESSIVE ASSOCIATION,    **CLASS ACTION COMPLAINT**

21          Plaintiffs,                  **DEMAND FOR JURY TRIAL**

22          vs.

23  UBER TECHNOLOGIES, INC., a Delaware
    corporation; UBER USA, LLC, a Delaware
24  limited liability company; RASIER, LLC, a
    Delaware limited liability company; and
25  RASIER-CA, LLC, a Delaware limited
    liability company,
26
            Defendants.
27  _____/

28

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

Plaintiffs Benjamin Valdez, Hector Castellanos, Worksafe, and Chinese Progressive Association (collectively, "Plaintiffs") bring this action against Defendants Uber Technologies, Inc.; Uber USA, LLC; Rasier, LLC; and Rasier-CA, LLC (collectively, "Uber" or "Defendants") and allege as follows based upon personal experience and the investigation of counsel:

## I.   **INTRODUCTION**

1.      This is an individual and class action for injunctive relief brought by two California non-profit organizations dedicated to protecting workplace rights – Worksafe and Chinese Progressive Association – and Benjamin Valdez and Hector Castellanos, Uber ride-share drivers, on behalf of themselves and a class of all similarly situated California Uber drivers, each of whom Uber has unlawfully pressured to support its Yes on Prop 22 campaign – an effort funded by Uber, Lyft, Instacart, and DoorDash with the goal of stripping gig economy workers like Valdez and Castellanos of their rights as employees under the California Labor Code and Industrial Commission Wage Orders.

2.      Since at least 1915, California has prohibited employers from pressuring, coercing, or otherwise interfering with their employees' right to engage in, or refrain from engaging in, political activities, including the employees' rights as Californians to vote for or against political candidates and ballot initiative measures.  As presently codified, Labor Code § 1101 expressly forbids employers from exploiting their economic power by "controlling or directing" the political activities of their employees, and Labor Code § 1102 forbids employers from using the threat of discharge or loss of employment to coerce, or attempt to coerce or influence any employee's free choice regarding whether to engage or refrain from engaging in "any particular course or line of political action or political activity."

3.      Despite California's longstanding prohibitions against employer interference with the political rights and freedoms of their employees, Uber has taken advantage of its raw economic power and its exclusive control over communications through its driver-scheduling app by wrongfully pressuring its drivers to actively support Proposition 22.  Uber has not only directed its drivers to vote for Proposition 22, but has also asked them to support the Yes on Prop 22 campaign by submitting video messages and statements that conform to Uber's political

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

position and by pressuring the drivers to submit statements of support for Proposition 22 and to respond to surveys regarding their voting preferences by stating they support Prop 22. Uber's solicitations have the purpose and effect of causing drivers to fear retaliation by Uber if they do not support Uber's political preference and may induce many drivers to falsely state that they support being deprived of the rights that California law guarantees to statutory "employees." Despite the intentionally skewed survey results obtained by Uber through the wrongful conduct alleged herein, Uber's ongoing statewide campaign makes the misleading claim that drivers support Proposition 22.

4.     Although Uber has long misclassified its drivers as independent contractors rather than employees, recent court decisions have made clear that those drivers (the plaintiff class members in this lawsuit) are – and have always been – employees under California law. That was true before the enactment of Assembly Bill 5 ("AB 5") in 2019 and even before the California Supreme Court's unanimous decision in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, which AB 5 codified; and it is certainly true now, as most recently confirmed by Judge Ethan Schulman in *People v. Uber Technologies*, San Francisco Superior Court Case No. CGC-20-584402 (*appeal pending* No. A160706). Nonetheless, in a coldly calculated self-interested effort to avoid the costs of complying with state law—including but not limited to complying with obligations to pay minimum wage and overtime wages, to provide meal and rest periods, to reimburse work expenses, and to pay unemployment insurance, workers' compensation, and other taxes that California law requires from employers—Uber, joined by such other prominent gig economy employers as Lyft, Instacart, and DoorDash, have poured close to two hundred million dollars into their campaign to enact Proposition 22, a ballot initiative that would overrule AB 5, *Dynamex,* and the underlying protections for plaintiffs and class members under the California Labor Code and IWC Wage Orders.

5.     This case challenges Uber's wrongful efforts to dictate to its drivers – a captive audience whose members are economically dependent on Uber for their jobs, their pay, and for the timely, favorable, and plentiful ride-sharing assignments that Uber can provide – how they should vote in the upcoming election and what they should do to support Uber's Yes on Prop 22

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

2

1   campaign.  Through public comments and extensive, repeated messaging that is triggered every

2   time a driver logs on to Uber's mandatory driver app, Uber has threatened plaintiffs and class

3   members that if they do not support Uber's political efforts regarding Proposition 22, those

4   drivers will lose their jobs or suffer other adverse work-related consequences.  Uber's threats do

5   not rest upon accurate, factual information.  Rather, the messaging Uber is using to coerce those

6   drivers' votes and to obtain those drivers' material support for the Yes on Prop 22 campaign (in

7   the form of positive survey responses and written and videotaped statements in support of the

8   Yes on Prop 22 campaign) rests on a series of knowingly false statements and misrepresentations

9   and implicit threats of retaliation against non-supporters, all of which are designed to increase the

10  wrongful pressure on those drivers to bend to Uber's corporate will.

11          6.      First, Uber makes a series of factually unfounded assertions that its California

12  drivers will lose their jobs unless Proposition 22 passes.  At times, Uber threatens that unless

13  Proposition 22 passes, Uber will cease all California operations, even though Uber knows that it

14  could continue to operate in California with drivers who are properly classified as employees.  At

15  other times, Uber inconsistently threatens that unless Proposition 22 passes, Uber will cut its

16  driver workforce in California by 70 percent, or fire everyone and rehire some.  As a result,

17  drivers reasonably believe that if they want to be among the 30 percent of drivers who are either

18  retained or rehired as employees, they must have affirmatively supported Uber's Yes on Prop 22

19  campaign by preparing videotaped and written messages of support and "correctly" answering

20  Uber's survey questions.  These threats are doubly unlawful.  First, these threats mislead

21  employees by stating that an across-the-board layoff and minimal rehire policy would be the

22  inevitable, immutable consequence of its drivers' failure to conform to Uber's political mandate.

23  These threats send a clear message that the only drivers who will have a chance of regaining

24  employment if Proposition 22 passes are those who have curried favor with Uber by actively

25  supporting its campaign.

26          7.      Second, Uber's captive-audience communications to its drivers falsely state what

27  the consequences would be to its drivers if Proposition 22 passes.  Uber warns its drivers that, to

28  the extent they might still have jobs after Proposition 22 passes (i.e., if they are re-hired after

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1  being laid off), they will lose scheduling flexibility, their earnings will be limited, they will be

2  barred from using other ride-sharing apps, and they will be forced to accept rides with poorly

3  rated riders.  Again, although Uber presents these scenarios as an immutable consequence of

4  Proposition 22's enactment, there is no *legal* reason why Uber could not operate with a

5  workforce of employees protected by the California Labor Code and Wage Orders like any other

6  employer – such as taxi companies.

7          8.     Third, Uber falsely states what the supposed benefits to its drivers would be if

8  Proposition 22 passes and Uber is permitted to classify drivers as independent contractors.  For

9  example, Uber asserts that the drivers would be entitled to a guaranteed minimum income of

10  120% of the California minimum wage, but fails to disclose that this supposed guarantee only

11  applies to hours in which they are engaged by an Uber rider and not to other time under Uber's

12  control which, under well-established California law, constitutes "work" time for which those

13  employees are entitled to be compensated.

14          9.     It is a bedrock principle of our democracy that all persons should be free to engage

15  in, or refrain from, political activity without coercion.  This principle has been codified in

16  California law for more than a century, and it reflects the Legislature's recognition in Sections

17  1101 and 1102 of the Labor Code that employers have the inherent power to wield enormous

18  coercive control over their employees, creating the risk that absent protective legislation,

19  unscrupulous employers might "misuse their economic power to interfere with the political

20  activities of their employees."  (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.

21  3d 463, 487.)  To protect workers from employers seeking to exploit that power for political

22  advantage, the Legislature enacted those statutes using the broadest possible language to describe

23  the range of political activities to which its prohibitions apply.  "These statutes cannot be

24  narrowly confined to partisan activity."  (*Id.* at 487.)  "The term 'political activity'" is broad

25  enough to include "the espousal of . . . a cause," and recognizes "the political character of

26  activities such as . . . the association with others for the advancement of beliefs and ideas."

27  (*Ibid.*)

28  ///

10.     Plaintiffs bring this action individually, and on behalf of all others similarly situated, to obtain declaratory and injunctive relief to stop Uber's unlawful and harmful practices, which subvert its employees' political freedom and the democratic process.  Plaintiffs' claims are brought under California Labor Code sections 1101 and 1102, and the Unfair Competition law. Plaintiffs have also submitted a PAGA notice to the LWDA and are in the process of exhausting the administrative process as a first step toward recovering the civil penalties made available to all aggrieved employees and the California Labor and Workforce Development Agency ("LWDA") under PAGA, Labor Code § 2689 *et seq*.  If the LWDA declines to pursue those penalties itself, Plaintiffs will amend this complaint to add a PAGA claim.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the claims raised in this Complaint and is the proper venue pursuant to Code of Civil Procedure sections 395.5, 410.10 for the following reasons:  (i) Defendants maintain their headquarters in San Francisco County; (ii) Defendants regularly operate, advertise, market, and/or employ drivers in San Francisco County and throughout the State of California; and (iii) a substantial portion of the underlying transactions and events complained of herein occurred, and affected persons and entities reside, in San Francisco County.

12.     Plaintiff Valdez properly exercised his right to opt out of Uber's forced arbitration requirement, although because he seeks public injunctive relief to enjoin Uber's ongoing violations of Labor Code sections 1011 and 1012.  Valdez and Castellanos would be permitted to pursue the relief sought herein even if he were subject to an otherwise binding Uber arbitration agreement because they are primarily seeking a public injunction and because Uber's arbitration agreements prohibit drivers from seeking relief that benefits anyone other than themselves.

## III.    THE PARTIES

13.     Plaintiff Benjamin Valdez is a citizen of California, residing in Los Angeles, California.  Valdez has worked for Uber as a driver from approximately August 2015 to the present.  Plaintiff Valdez validly opted out of Defendants' arbitration policy.

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

14.     Plaintiff Hector Castellanos is a citizen of California, residing in Antioch, California.  Castellanos has worked for Uber as a driver for approximately the last three years.

15.     Plaintiff Worksafe is a California-based organization dedicated to promoting and protecting the basic right of all people to a safe and healthy workplace.  For nearly 40 years, Worksafe has led campaigns that have made California a national leader in occupational safety and health ("OSH").  Worksafe provides leadership and coordination among labor, legal, and public health advocates to pass protective OSH laws.  Their initiatives prioritize issues of concern to low-income, immigrant, and contingent workers, including Uber drivers.

16.     Plaintiff Chinese Progressive Association ("CPA") is a nonprofit that develops the leadership of Chinese immigrant working families in San Francisco to improve living and working conditions for all.  CPA's Workers Rights' programs include wage theft case support, hospitality job training program, community education and outreach, grassroots leadership development and policy advocacy.  Their membership includes Uber drivers.

17.     Defendant Uber Technologies, Inc. is a Delaware corporation that maintains its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California 94103.

18.     Defendant Uber USA, LLC is a Delaware limited liability company that maintains its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California 94103.

19.     Defendant Raiser-CA, LLC is a Delaware limited liability company that maintains its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California 94103.

20.     Defendant Rasier, LLC is a Delaware limited liability company that maintains its principal place of business at 1455 Market Street, Fourth Floor, San Francisco, California 94103.

21.     Defendant Uber Technologies, Inc. is the parent company of Defendants Uber USA, LLC, Rasier, LLC, and Rasier-CA, LLC.

22.     Rasier, LLC and Raiser-CA, LLC (collectively, "Rasier Defendants") act as intermediaries between Uber and its drivers by managing those drivers' contracts and tax forms and by issuing payments from Uber to its drivers.  Uber's drivers have no way to contact the

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1   Rasier Defendants but can only communicate through Uber.  The Rasier Defendants are merely

2   instrumentalities of Uber, because they are undercapitalized and because Uber controls all

3   material aspects of their operations.

4   **IV.    FACTS COMMON TO ALL CAUSES OF ACTION**

5          23.    Uber is a transportation network company that employs drivers to provide rides to

6   customers.  Uber competes with other transportation services, including public transportation,

7   other ride-sharing services, and taxis.

8          24.    Uber's drivers provide rides to customers who request transportation services via

9   Uber's customer application on their smartphones.  Uber's driver application ("app") assigns

10  those rides to drivers in the vicinity.

11         25.    Uber gathers an immense amount of information on both its customers and its

12  drivers.  Uber tracks its drivers' behavior and performance, using data from their phones.  Uber

13  uses the data to "identify unsafe driving behavior such as speeding or harsh braking and

14  acceleration."  It uses this data along with user ratings "as grounds for deactivating drivers."  It

15  also uses driver data to "match available drivers . . . to users requesting services . . . based on

16  availability, proximity, and other factors."  Uber gathers location data from riders "when the

17  Uber app is running in the foreground (app open and on-screen) or background (app open but not

18  on-screen) of their mobile device."  It also gathers the content of certain in-app communications

19  between drivers and customers, "including the date and time of the communications and the

20  content of the communications."  And Uber gathers data about how its apps are used, by, among

21  other things, using "cookies, pixels, tags, and similar tracking technologies that create and

22  maintain unique identifiers."  Information about Uber's policies are available at

23  https://www.uber.com/legal/en/document/?country=united-states&lang=en&name=privacy-

24  notice.

25         26.    Uber uses a complex algorithm to "match" drivers to riders.  That algorithm does

26  not just prioritize the lowest wait-time for users.  Uber states that it "may also modify pairings of

27  drivers and riders in certain instances to help maintain a safe platform; for example, [it prevents]

28  matches if one has given the other a one-star rating in the past."  Information about Uber's

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1    matching algorithm is available at https://marketplace.uber.com/matching.

2         27.    Uber regularly deactivates drivers.  It warns:  "If you violate any applicable terms

3    of use, terms of the contractual agreement you agreed to when signing up for an account with

4    Uber, or any of these Community Guidelines, you can lose access to the Uber apps."  Uber states:

5    "There will always be unforeseen events that may ultimately lead to you losing access to the

6    Uber apps—and we'll update these guidelines regularly—but the [Community G]uidelines are

7    sufficient cause for Uber to take action."  Those Community Guidelines, among other things,

8    counsel drivers:  "It may be a good idea to stay away from personal topics that can potentially be

9    divisive, like religion and political beliefs."  Uber can prevent drivers from working with no prior

10   notice.  Its Community Guidelines state:  "If we are made aware of potentially problematic

11   behavior, we may contact you so we can look into it.  We may, at our sole discretion, put a hold

12   on your account or turn your account inactive until our review is complete."  Uber's policies are

13   available at https://www.uber.com/legal/en/document/?country=united-

14   states&lang=en&name=general-community-

15   guidelines&_ga=2.82086358.1108171285.1603313261-1530897627.1603313261.

16        28.    These policies make clear to drivers that Uber is carefully monitoring the drivers'

17   actions, including their use of Uber's app.

18        **A.    Uber is Promoting Proposition 22 to Evade Its Obligations as an Employer**
          **Under California Law**

19

20        29.    Plaintiffs and all other California drivers are properly classified as employees and

21   are entitled to California Labor Code sections 1101 and 1102's protections, as well as to the

22   protections of all other provisions of state law that apply to "employees" rather than "independent

23   contractors."

24        30.    The California Supreme Court landmark decision in *Dynamex*, 4 Cal. 5th 903,

25   clarified California law and established the ABC test for determining whether workers are

26   "suffered or permitted to work" and are therefore "employees" rather than "independent

27   contractors" under California law.

28   ///

8

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

31.    The California Legislature codified *Dynamex* by enacting AB 5, which went into effect on January 1, 2020.

32.    Uber and other gig economy employers devoted substantial efforts to lobbying the Legislature to obtain an exemption from AB 5, and they failed.  According to Judge Dolly M. Gee of the Central District of California, who rejected a challenge to Legislature's decision not to carve out gig economy companies like Uber from the responsibility to treat their core workers as "employees," the "Legislature was not improperly motivated by animus or lobbying" in their unwillingness to create an exemption for the "gig economy."  (*Lydia Olson, et al. v. State of California, et al.*, Case No. CV 19-10956-DMG (RAOx), Sept. 18, 2020, Order Re Defendants' Motion to Dismiss (Dkt. No. 76), at 10.)

33.    Uber and other similarly situated companies then turned their sights to a ballot initiative, identified on the upcoming November 2020 ballot as Proposition 22, which those companies drafted and have thus far spent more than $188 million dollars to promote, including through the unlawful means alleged herein.  (*See* https://www.sos.ca.gov/campaign-lobbying/cal-access-resources/measure-contributions/2020-ballot-measure-contribution-totals/proposition-22-changes-employment-classification-rules-app-based-transportation-and-delivery-drivers-initiative-statute (last visited Oct. 21, 2020).)

**B.    Proposition 22 Offers Considerably Fewer Protections to Uber Drivers Than Current California Law Provides**

34.    If passed by the electorate, Proposition 22 would reclassify employees who drive for app-based rideshare and delivery companies, including Plaintiffs and all class members.  (*See* Proposed Bus. & Prof. Code § 7451 (available at https://vig.cdn.sos.ca.gov/2020/general/pdf/topl-prop22.pdf (last visited October 20, 2020).) Those drivers would lose the benefits and protections that they are currently entitled to as "employees" under California law.  (*Id.*, §§ 7453-7457.)  The chart below demonstrates how Proposition 22, if enacted into law, would dramatically reduce the protections currently guaranteed to employees under California law:

///

|  | **Under Current State and Federal Law** | **Under the Ballot Proposition** |
|---|---|---|
| **Wages** | Clear minimum wage; guaranteed overtime (150 percent of wages for work over 8 hours in one day, 40 hours in one week) | No overtime; workers would be eligible to earn 120 percent of the local minimum wage, but only for "engaged time" (time picking up and transporting passengers), and would not be compensated for the time they must be signed onto the app to wait for a fare or for any other required work time |
| **Expense Reimbursement** | All expenses reimbursed (mileage, cell phones, car cleaning, etc.) – standard IRS rate is over 57 cents pers mile | Thirty centers per mile, but only mileage expenses for "engaged" miles (e.g., no reimbursement for time without package/passenger) |
| **Workers' Compensation** | No-fault coverage for work-related injuries | Not "no-fault," easier for insurers to deny coverage |
| **Paid Family Leave** | Eight weeks of paid leave | None |
| **Paid Sick Days** | Three days of paid leave for illness or care of family – up to ten in some cities; additional COVID-19 leave in some cities | None |
| **Unemployment Compensation** | Up to 26 weeks of cash benefits after no-fault job loss | None |
| **Disability Insurance** | Lifetime access to wage replacement if injured | Limited – caps total coverage for 104 weeks |
| **Health Insurance** | Access to federal benefits under the Affordable Care Act | Limited – stipend only available to drivers who work over 15 hours of "engaged" time for one company, and calculated based on "engaged" time, reducing the benefit amount |
| **Discrimination** | Protection against discrimination based on a broad set of characteristics | No explicit protection against discrimination based on immigration status |
| **Right to Organize and Collectively Bargain** | Could be created under state law | None |
| **Protection from Retaliation** | Protection from termination or discipline for reporting harassment, discrimination, or wage theft | None |
| **Health and Safety** | Requirements put in place injury prevention plans; give workers access to sanitation facilities | No similar requirement |

(*See* Rey Fuentes, Rebecca Smith, & Brian Chen, "Rigging the Gig: How Uber, Lyft, and DoorDash's Ballot Initiative Would Put Corporations Above the Law and Steal Wages, Benefits, and Protections from California Workers" (July 2020), page 2 (available at

CLASS ACTION COMPLAINT

CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

https://s27147.pcdn.co/wp-content/uploads/Rigging-the-Gig_Final-07.07.2020.pdf) (as modified).)

**C.  Uber is Attempting to Direct Its Employees' Political Actions Through a Coercive Campaign of Misinformation**

35.   Uber is exerting extreme and wrongful pressure on its drivers to vote for and advocate for the passage of Proposition 22 in the 2020 election.  In plain violation of the worker free-political-choice guarantees of Labor Code section 1101, Uber developed, funded, and ruthlessly implemented its statewide campaign of controlling, directing, and tending to control or direct the political activities or affiliations of its drivers.

36.   Through Uber's app, it communicates directly with its entire fleet of drivers. Drivers must use the app to obtain work, because Uber assigns and tracks rides through its app, accepts customer payments through its app, and does not make any other means of communications or operations available to its drivers or customers.

37.   In or around August 2020, Uber began forcing its drivers to read Uber's barrage of misinformation about Proposition 22.  These messages appear in three different ways.

38.   First, when drivers sign on to the app, the first screen they see has sometimes contained a directive to vote yes on Proposition 22, along with links to further information.  The driver must click through Uber's instructions and information regarding Proposition 22 to begin accepting rides.

39.   Second, when drivers sign off, the log off screen often directs them to vote for Proposition 22.  Many drivers repeatedly log on and off the app during a shift.

40.   Third, Uber messages its drivers asking them to take action to support Proposition 22, to vote for Proposition 22, and to read Uber's misleading information about Proposition 22. When drivers are using the app, they can see when they have unread messages in their inboxes. If they are not using the app, it sends them notifications that appear on banners on their phones notifying them that they have a message from Uber.  Uber drivers are incentivized to check their messages.  For example, Uber messages drivers about "quests," which provide drivers the opportunity to earn more by reducing Uber's fees when the drivers reach certain trip goals in a

11

1   set amount of time.

2        41.    A representative sample of Uber's solicitations and advertising materials are

3   attached hereto as Exhibit A, which are true and correct copies of the solicitations and advertising

4   materials that Plaintiff Valdez, like all other similarly situated Uber drivers in California, recently

5   received upon logging into Uber's app.

6                    **1.    Uber is Threatening its Drivers with the Loss of Their Employment**

7        42.    Uber is using unlawfully coercive tactics and wrongful threats of job loss to

8   pressure its employees into voting for Proposition 22 and into providing material support to Uber

9   and other gig economy employers in their efforts to promote Proposition 22 through false

10  statements, omissions of essential facts, and misrepresentations, including misrepresentations

11  concerning the supposed overwhelming support for Proposition 22 from those companies' own

12  drivers.

13       43.    Uber has directly threatened in public statements that its drivers would lose their

14  jobs if Proposition 22 fails at the ballot box and Uber is required to pay its employees as

15  "employees" and to pay taxes to state and local government as an "employer" of those

16  "employees."  On August 19, 2020, after the San Francisco Superior Court (Schulman, J.)

17  enjoined Uber from continuing to misclassify its drivers as independent contractors, Uber

18  communicated to its drivers through misleading public messaging that it would be impossible for

19  Uber to continue providing rides in California – meaning all drivers would lose their jobs –

20  unless Proposition 22 passed.  Uber plainly stated in its public statements that it would have no

21  choice in the matter.  CEO Dara Khosrowshahi said, "Whether we close down or not is really up

22  to the courts and it's totally out of our control at this point."  Without a stay of the Superior

23  Court's injunction, Mr. Khosrowshahi said, "Essentially the service has to shut down."[1]

24

25        _____
          [1] https://www.politico.com/states/california/story/2020/08/19/uber-and-lyft-threaten-to-
26  take-their-cars-and-go-home-1310414; *see also* https://www.marketplace.org/2020/08/20/uber-
    lyft-can-keep-driving-california-for-now/ ("Uber CEO Dara Khosrowshahi had repeatedly said
27  its service would have no choice but to stop providing rides in California if the state's law goes
    into effect."); https://www.fastcompany.com/90542330/california-countdown-begins-as-lyft-
28  threatens-to-shut-down-tonight-at-1159-p-m ("Uber said, 'We've appealed this decision, but if
    we are not successful in our appeal, we will need to temporarily shut down by Thursday night.'").

CLASS ACTION COMPLAINT
                                        CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

44.     Between August 2020 and the present, Uber has also consistently threatened its drivers through the messages on the driver app by representing that if Proposition 22 did not pass, rideshare in California would be "at-risk" and most drivers would lose their jobs because Uber would shut down its California operations.

45.     When the Superior Court issued its injunctive order requiring Uber to comply with its legal obligation to classify Plaintiffs and class members as "employees," Uber sent the message below to its drivers, including Plaintiff Valdez, stating, "We may have to temporarily suspend ridesharing starting this week."  This message sent a clear and chilling signal to its California drivers that the decision whether to suspend operations in California was a matter over which it had no choice but was directly tied to the success or failure of its Yes on Prop 22 campaign:

### Rideshare in California is at risk

We may have to temporarily suspend ridesharing starting this week.

We know you rely on Uber to earn and hope that we're able to continue operating.

We remain committed to getting you access to new benefits and protections with Prop 22.

[ Learn more ]

Ex. A at 27.  When the Plaintiff Valdez and other drivers clicked on "Learn more," they were



### Rideshare in California is at risk

August 18 / US

We may have to temporarily suspend ridesharing in California starting this week.

The California Attorney General obtained a court order that requires rideshare companies to hire drivers as employees—immediately—or else shut down.

We've appealed this decision, but if we are not successful in our appeal, we will need to temporarily shut down by Thursday night.

We know that riders rely on Uber to get around, and drivers rely on the Uber app to earn income. We wanted to let you know that this is a possibility, so you can plan accordingly.

We remain committed to helping drivers get access to new benefits and protections without compromising the flexibility they have today via Proposition 22, which is on the ballot this November. You can learn more about Prop 22 here.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

taken to a screen elaborating on these threats:

Ex. A at 41-43.  In this screen, Uber explains, "The California Attorney General obtained a court order that requires rideshare companies to hire drivers as employees—immediately—or else shut down.  We've appealed this decision, but if we are not successful in our appeal, we will need to temporarily shut down by Thursday night."

46.    Uber has also threatened its drivers, and has announced to the public at large (including plaintiffs and class members), that if Proposition 22 does not pass, its entire workforce will have to reapply for their jobs and only "3 out of 10 drivers [rather than none] would be hired as higher prices and longer wait times reduce demand for rides."  Ex. A at 16.

47.    On another page of its app, Uber argues to drivers that a "No on Prop 22" will result in a "Limited number of drivers allowed on the platform (only 20-30% of current drivers)." Ex. A at 6.  Uber is explicitly threatening a loss of employment for between 70% to 100% of its workforce in order to pressure its drivers to engage in political activity supporting Proposition 22 and supporting Uber's efforts to mislead the electorate into believing that Proposition 22 actually enjoys far broader driver support than it does.

48.    Uber's threat of loss of driver employment if Proposition 22 fails are false and misleading because Uber could choose to continue its operations in California, even with its drivers properly classified as "employees," as long as it complies with all applicable laws – as it should have been doing for years.  If Uber decides to shut down its operations in California, or 70% of its operations in California, that would be a choice made by Uber for its own discretionary internal business reasons.  Such a result would neither be compelled by law or circumstances.  Yet Uber never disclosed to its drivers that Uber alone will make that decision, or that the decision to leave California or, alternatively, to eliminate 70% of its driver workforce, is just another business decision based on Uber's assessment of its short- and long-term profit projections.

## 2.    Uber Directs Its Employees to Engage in Specific Political Activities, Which It Uses to Further Support Its Proposition

49.    Not only does Uber repeatedly and materially mislead its drivers about the

1  supposedly inevitable or immutable outcomes if Proposition 22 passes or fails to pass, Uber

2  deploys that misleading to coerce its drivers to take affirmative steps to manifest their support for

3  Proposition 22.  This includes asking drivers to respond to Uber's opinion surveys, which Uber

4  can monitor – and thus reward or punish as it sees fit.

5        50.     Uber uses the submission form below to solicit videos of support from its drivers,

6  each of whom is reasonably aware that Uber will know whether or not that driver has submitted a

7  video and what the content of that video may be, and that Uber has the power to punish any

8  employee who does not submit a supporting video:



20  Ex. A at 23-24.  The App's survey strongly suggest to the reader that Uber is soliciting videos

21  that support the Yes on Prop 22 campaign, for example by asking the drivers to address "Why is,

22  or isn't, flexibility important to you?," to suggest as an answer to "Do you support Prop 22?

23  Example:  I support Prop 22," and to suggest as an answer to "Why do you support or not support

24  Prop 22?  Example:  I support Prop 22 because. . ."

25        51.     At no time in any of these materials does Uber assure the drivers that it will not

26  monitor their answers or that it will not, now or in the future, favor those drivers with better work

27  opportunities if they actively support Uber's efforts to solicit favorable videos and other

28  statements, or to punish others who do not.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

### 3.   While Providing Drivers with Misinformation about Proposition 22, Uber Also Asks Drivers to Declare Their Support for the Proposition

52.    In addition to asking drivers to provide media to support Proposition 22, the company also uses the driver app to ask drivers whether they support Proposition 22, which enables Uber to tell the public how popular Proposition 22 is among its workforce:

> Do you support Prop 22?
>
> Let us know where you stand. We'd like to let your customers know if you support Prop 22.
>
> Yes, I support Prop 22
>
> No, I don't support Prop 22
>
> I'm not sure

Ex. A at 35.  By the time a driver reaches this page in the drivers app, Uber has already made its position abundantly clear, and any driver will reasonably understand that Uber is not only strongly encouraging the driver to answer the survey by stating, "Yes, I support Prop 22," but that Uber is also uniquely positioned, as the driver's employer, to reward or punish those drivers who answer, or fail to answer, those survey questions in the manner Uber has implicitly demanded.  Drivers could reasonably believe that if they do not state explicitly that they support Proposition 22, Uber will deactivate them from the platform or decline to match them with favorable rides.

53.    Uber has also repeatedly prompted drivers to declare their support for Proposition 22.  One of these prompts, pictured below, only provides the opportunity for drivers to vote "YES ON PROP 22" or "OK."  This pressures drivers to accept Uber's position because it does not provide an option to vote no.



CLASS ACTION COMPLAINT
CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

54.     Another screen provides videos of drivers talking about Proposition 22, with the lead-in, "Drivers talk about why Prop 22 would make a difference."  Each of the videos in the sample were strongly in favor of Proposition 22, again reinforcing Uber's message that Yes on Prop 22 is the political position it is urging its drivers to adopt and to allow Uber to announce publicly in its campaign materials.



Ex. A at 45.

55.     In another message, Uber writes about how "we've been highlighting some of the key benefits of Prop 22," and "we've heard [from drivers] why setting a new standard for flexible work is so important.  That's what we're fighting for."  That message then provides a link where drivers can watch select videos extolling the benefits, but none of the detriments, of Proposition 22:

Hi Benjamin,

Over the past few weeks, we've been highlighting some of the key benefits of Prop 22, like a minimum earnings guarantee, healthcare contributions, and occupational accident insurance.

We've also been listening. We asked drivers to tell us what Prop 22 would mean to them, and we've heard why setting a new standard for flexible work is so important. That's what we're fighting for.

Now we want to share one of the stories we've received, so you can hear what other drivers are saying:

**Click here to watch**

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT

CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

Ex. A at 40. Uber then solicits its drivers to provide similar Yes on Prop 22 videos, instructing those drivers to, "Send us a video and share your story *about what the benefits of Prop 22 would mean for you*. Together, we can make our voices heard," further suggesting that the drivers' voices should be aligned with Uber's voice, and again failing to provide any assurance that Uber would not retaliate against those workers who did not cooperate or favor those workers who did cooperate. (emphasis added.)



56. In a segment titled "Help," Uber instructs, "Take our online poll" and "Let us know where you stand on Prop 22," alongside the "Yes 22" official campaign logo, to remind the drivers of its guidance on how to answer:

Ex. A at 1, 45. This online poll, like all of the "survey" questions posed by Uber to its drivers, allows Uber to monitor each driver's response or non-response, and thus to determine which employees to favor and which to disfavor with more or better rides or future re-employment if Proposition 22 fails and all drivers are required to re-apply for employment.

///

CLASS ACTION COMPLAINT

CASE NO. _____

57.     Another screen shows the purported results of the "online poll" solicited in the earlier screen, stating:  **"72% of drivers and delivery people have already said they're voting yes on Prop 22.**  Together, we can secure the future of flexible work.  That's why we're fighting so hard to pass Prop 22."  Ex. A at 11.  This statement is false and misleading because it suggest that 72% is an accurate, unbiased figure, when it fact it is the consequence of the many pressures to conform to Uber's preferred position, as alleged herein.

### 4.     Uber Is Explicitly Directing Its Employees to Vote Yes on Proposition 22

58.     Over and over again, Uber explicitly urges its employees to vote yes for Proposition 22 and including through its frequent placement of the official logo of the "Yes on Prop 22" campaign within the app:



Ex. A at 1-3, 8, 15, 20, 28-30, 32-34, 37, 39, 44-46.

59.     At the end of a series of screens in which Uber represents what the supposed detrimental effect on rides would be if Proposition 22 does not pass, Uber tells its workers, "Your support is critical.  Vote yes on Prop 22."  The "Vote yes on Prop 22" linked is hyperlinked to the official campaign.



**Drivers deserve better**

Your support is critical. Vote yes on Prop 22.

Ex. A at 20.

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT
CASE NO. _____

60.     In another screen, the "Yes 22" official campaign logo is at the top, followed by the larger official campaign logo "YES ON PROP 22 Save App-Based Jobs & Services." Uber tells drivers on this screen, "During an economic crisis where millions of Californians are out of a job, the state should be focusing on creating job opportunities, not threatening your right to choose flexible and independent work."  Below that, Uber presents an image of a check mark in a box, with the text "SOLUTION:  Yes on Prop 22 Save App-Based Jobs & Services."



Ex. A at 8.

61.     Uber then instructs drivers, "Join the Yes on Proposition 22 Coalition to Stay Updated."

///

///

///

///

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT
CASE NO. _____



Ex. A at 46.

62.     In another screen, Uber urges drivers: "**Make your voice heard by voting and talking to your customers.**  Together, we can ensure that Prop 22 passes" (emphasis in original).

63.     In another message, Uber explains, "How a yes or no vote on Prop 22 would affect you," followed by a white car with a speech bubble saying "Yes on 22" and then urging drivers to "join[]" the "72% of drivers and delivery people [who] have already said they're supporting Prop 22."



How a yes or no vote on Prop 22 would affect you

Yes on 22

72% of drivers and delivery people have already said they're supporting Prop 22. By joining them, you'll help create a better, more secure future for flexible work by delivering benefits that include:

Ex. A at 11.

### 5.     Uber Is Misleading Its Employees About Other Consequences if Proposition 22 Passes

64.     Uber also wrongfully induces and coerces Plaintiffs and class members into supporting Proposition 22 and providing material support to Uber's efforts to obtain public

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1 support for Proposition 22 by misleadingly emphasizing Proposition 22's supposed driver

2 benefits to Uber drivers without acknowledging that those benefits are far less protective and

3 comprehensive than the benefits currently available to those drivers as "employees" under current

4 California law.

5   65. For example, Uber makes misleading statements in the messages to drivers on its

6 driver app concerning the earnings guarantee, expense reimbursement policy, and anti-

7 discrimination protections that would be available if Proposition 22 passes:

## We believe a better way to work is possible

Apps like Uber are great for finding flexible work that can help you make ends meet. But it can sometimes be hard to know exactly how much you will make by driving or delivering food.

That's why we're fighting for **Prop 22**: it will give you an earnings guarantee so that you can always know the minimum you will earn for your time.

Prop 22's earnings guarantee includes:

- **Minimum earnings:** If you earn less than the guarantee (120% of minimum wage over 2 weeks) Uber will pay you the difference.
- **Expense reimbursement:** This earnings guarantee includes $0.30 per mile to account for your expenses, such as gas and vehicle wear-and-tear.
- **No upper limit:** The minimum is just that— a minimum. There's no upper limit to how much you can earn on the app.
- **Tips are on top:** As always, you keep 100% of the tips you earn for the service you provide. And these tips are not included in how the minimum guarantee is calculated.

In this case, the driver would have a total earnings guarantee of $462.

- $0.30 x 500 miles = $150
- 1.2 x $13 x 20 hours = $312
- $150 + $312 = **$462 total minimum earning guarantee**

So, in this example, if the driver makes less than $462 ($23.10/hour in this case), Uber would pay the driver the difference.

**In addition to this earnings guarantee, Prop 22 would also give you access to new benefits, like healthcare, and new protections against discrimination.**

**To make this a reality, we need to update our outdated laws. We need Californians to vote YES on Prop 22.**

We believe drivers and delivery people deserve better. We will continue to advocate for you and do everything we can to keep you moving in California.

22 Ex. A at 25-26.

23   66. Another set of messages promoted by Uber on its driver app make misleading

24 representations about occupational accident insurance:



CLASS ACTION COMPLAINT
                   CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

# Prop 22: A better way to work

Choosing flexible work shouldn't mean forgoing basic benefits. That's why we're fighting for Yes on Prop 22.



**Minimum earnings guarantee**
Earn at least 120% of minimum wage plus $0.30 per mile for expenses, with no upper limit on how much you can earn.



**Healthcare benefits**
Receive a stipend of at least $300* a month (depending on how much you drive) toward health insurance or medical care.



**Occupational accident insurance**
Cover medical bills if you're injured while driving or delivering.

Ex. A at 34.

67.     Uber's representation that Proposition 22 will create an "earnings guarantee" is misleading because, as employees, Uber's drivers are already guaranteed a minimum wage for all time they are under Uber's control and/or are suffered or permitted to work by Uber.  Uber's representation that Proposition 22 will pay 120% of the minimum wage is also misleading because it fails to reveal that Proposition 22 would only pay drivers for the time they are engaged by riders, and would not compensate them for the other required work time, including the time required to be signed into the app to wait for a rider to solicit a ride, which is compensable work time under current California law.

68.     Similarly, Uber's representation that Proposition 22 creates an entitlement to expense reimbursements fails to reveal that under current law, Uber's drivers are already entitled to a greater range of expense reimbursements, including for mileage, cell phone usage, and car cleaning, and that the IRS's standard rate for mileage reimbursement is more than $0.57 cents per

CLASS ACTION COMPLAINT
CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1    mile – much higher than the $0.30 provided for limited expenses under Proposition 22.

2        69.    Uber further fails to reveal that Proposition 22's anti-discrimination protections

3    are far less protective than the protections currently guaranteed to employees under California

4    law, including most notably that Proposition 22 does not prohibit discrimination based on

5    immigration status.  On information and belief, a high proportion of Uber drivers are immigrants

6    or are likely to be perceived as immigrants by Uber and the general public, and would be

7    protected by California's anti-discrimination laws but for Proposition 22, if the proposition

8    passes.

9        70.    Uber further fails to reveal that its drivers, as employees, are currently entitled to

10    worker's compensation if they are injured and that in contrast to California's extensive worker's

11    compensation protection program, Proposition 22, if enacted, would not provide any coverage for

12    injuries to drivers who were "at-fault" for their on-the-job injuries.  Uber further fails in its

13    messaging to reveal the limitations on Proposition 22's healthcare coverage.

14        **6.    Uber Is Misleading Its Employees About the Consequences of
15              Proposition 22 Not Passing**

16        71.    Uber's messages mislead its employees about the implications of Proposition 22

17    not passing.  Uber misleadingly asserts in its messaging to its driver that if Proposition 22 fails to

18    pass, Uber's drivers will be required to re-apply for work, will lose their scheduling flexibility,

19    will lose their freedom to drive for more than one company, and will have to accept undesirable

20    riders thereafter.  Nothing in the current law requires Uber to make these policy changes.

21    Nothing in California employment law precludes an employer from offering scheduling

22    flexibility to its employees or allowing employees to work part-time for multiple employers.

23    Nothing in California law requires an employer to force its workers to accept all available work

24    assignments or to provide services to all prospective customers (if those customers are not

25    rejected for unlawful reasons).  And Uber's requirement that all driver employees will be

26    required to reapply to work in their existing jobs if Proposition 22 is defeated reinforces the

27    chilling effect of Uber's wrongful campaign of influence and coercion.  After all, if an employer

28    retains the right to pick and choose which 30% (or other percentage) of its workforce it will "re-

1  hire" after soliciting their mass resignations, the employees wishing to be re-hired will have a

2  strong economic incentive to curry favor and avoid upsetting their employer, and will be

3  pressured into demonstrating to their employer that they support that employer's preferred

4  political position, as here, where Uber has demanded that its employees affirmatively and

5  publicly support its Yes on Prop 22 campaign by submitting videos and written statements and by

6  responding to survey questions asking whether those employees support Proposition 22.

7          72.     Repeating the "Yes 22" official campaign logo, Uber's App poses the question:

8  "What if Prop 22 doesn't pass?":



18  Ex. A at 15.

19          73.     The next screens falsely represents, as if an immutable consequence of Proposition

20  22 not passing, that "Driving jobs would be limited," and that "We estimate only 3 out of 10

21  drivers would be hired as higher prices and longer wait times reduce demand for rides."  Above

22  that message is a picture of an "Employee sign in" screen, suggesting that drivers who are

23  classified as employees must know their employee ID number and password to sign in, and if

24  they are not employees, they need to go through a process to "Apply now," with the outcome of

25  such an application in doubt:

26  ///

27  ///

28  ///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT
CASE NO. _____



Ex. A at 16.

74. The next screen says, "Flexibility would be limited," along with an image of a calendar suggesting drivers would have to work specified, predetermined times if classified as employees:

Ex. A at 17.

75. The next screen says, "Shifts would be scheduled," below a large red banner suggesting that the driver is locked out of the app because of scheduling restrictions due to employee classification:

///

///

///

CLASS ACTION COMPLAINT
CASE NO. _____



Ex. A at 18.

76.     The next screen says, "Every trip would be accepted," below an image of a ride with a passenger with an extremely low (4.32) rating, suggesting that the driver would be forced to accept all rides, including with extremely undesirable passengers who might be rude, drunk, violent, or prone to causing damage to the driver's car.

Ex. A at 19.

77.     Another screen warns that "a no vote on Proposition 22 could drastically impact the driver experience," and provides a side-by-side comparison of the future Uber driving experience under "Yes on Prop 22" and "No on Prop 22", all of which are business decisions Uber could choose to implement as a discretionary matter, not as a legal requirement:

///

///

///

///

CLASS ACTION COMPLAINT
CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

| Driving experience with Uber | Yes on Prop 22 | No on Prop 22 |
| --- | --- | --- |
| Work when and where you want | ✓ | ✗ |
| No upper limit on what you can earn | ✓ | ✗ |
| Work using multiple apps | ✓ | ✗ |
| Must accept all trips | ✗ | ✓ |
| Limited number of drivers allowed on the platform (only 20-30% current drivers) | ✗ | ✓ |

Ex. A at 12.

**D.      Uber Drivers are Protected by the Labor Code.**

78.      Plaintiffs and all other California drivers are properly classified as employees and entitled to California Labor Code sections 1101 and 1102's protections.  In California, as confirmed by AB 5, workers are presumed to be employees unless the hiring entity can affirmatively establish that all three factors of the "ABC" test exist.  The three factors are: (A) the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; (B) the worker performs work that is outside the usual course of the hiring party's business; and (C) the worker is customarily engaged in an independently established trade, occupation or business of the same nature as the work performed.  *Dynamex, supra*, 4 Cal. 5thh at 957; Lab. Code § 2750.3(a)(1).

**1.      Uber Drivers Perform Work Within the Usual Course of Uber's Business (Factor B).**

79.      Uber's drivers perform work that is within the usual course of Uber's business. Uber is a transportation company in the business of selling on-demand transportation services by

CLASS ACTION COMPLAINT
CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

assigning drivers to riders using its app.  The Rasier Defendants, acting as instrumentalities of Uber as discussed above, are also transportation companies in the business of selling on-demand transportation services.

80.     Uber advertises and markets itself to the public as providing on-demand transportation services.  *See* https://www.uber.com/us/en/ride/ ("**Rides on demand**" "Request a ride at any time and on any day of the year." (emphasis in original) (last visited Sept. 3, 2020)). Uber trademarked the slogan "Everyone's Private Driver" to use in its business.

81.     Uber has in fact admitted that drivers are at the heart of their business model.  "If we are unable to attract or maintain a critical mass of Drivers . . . our platform will become less appealing to platform users, and our financial results would be adversely impacted . . .  Any decline in the number of Drivers . . . using our platform would reduce the value of our network and would harm our future operating results."[2]

82.     The work that Uber's drivers perform is the core purpose of Uber and the Rasier Defendants' business.  The fact that the Defendants use a mobile phone application as the means to sell rides, including assign work to Drivers, pay drivers, collect payments from riders, and communicate to drivers and riders, does not change the fact that Defendants are a transportation company.  Defendants' business simply would not exist without drivers.

83.     Accordingly, Uber drivers, including Plaintiffs, perform work within the usual course of Defendants' business.

        2.     **Uber Drivers Are Engaged in the Same Business as Defendants (Factor C).**

84.     Uber drivers, including Plaintiffs, are not engaged in an independently established trade, occupation, or business of the same nature as the work they perform for Defendants.  Uber drivers, like Plaintiffs, are dependent on Defendants to identify riders for them.

---

[2] *See* Uber Securities and Exchange Com. S-1, pp. 28-29, emphasis in original; also available at https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm) (last visited Sept. 3, 2020).

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT

CASE NO. _____

85.     Plaintiffs and other Uber drivers are not engaged in their own on-demand transportation business.  Rather, they are providing transportation services to customers to generate income for Defendants.

86.     Plaintiffs and other Uber drivers do not need to possess any particular or special skills other than those required to obtain a driver's license, to provide on-demand rides on Uber's app.  Defendants provide drivers with the necessary tool to perform their work for Defendants, i.e., the Uber app.

87.     Defendants' app is the only means that drivers can perform their work for Defendants.

88.     Defendants prohibit drivers from setting or in any way affecting the rates of pay for their own services.  Defendants are solely responsible for recording its drivers' rides, including the time and distance for each ride, the ride fare and added Defendants' fees, any tips, and for compiling its drivers' rates of pay for each ride.  As a result, Defendants prevent drivers from attaining the profits and losses that are a key characteristic of running an independent business.

89.     Defendants also prohibit Plaintiffs and other drivers from communicating with riders about future ride services and from exceeding Uber's specified limit on the distance allowed for each ride.  As a consequence, drivers are prevented from marketing themselves for repeat customers outside of Defendants' app.

90.     Uber Drivers lack flexibility and independence in their work for Defendants because Defendants limit drivers' ability to freely decline ride requests that drivers think will be unprofitable, to see all ride requests in their area so they can decide for themselves regarding their potential earnings, and to share their accounts with other drivers resulting in its drivers' inability to individually expand their services.

91.     Accordingly, Defendants' drivers are not engaged in an independently established trade, occupation, or business as Defendants, and thus Defendants cannot satisfy factor C of the ABC test.

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

30

### 3.  Uber Controls and Directs its Drivers' Work (Factor A).

92.     As a condition of employment, Defendants have required that their drivers, including Plaintiffs and class members, enter into written agreements that, among other things, direct the manner in which drivers perform their work, and control the terms of their compensation.  Defendants also maintain uniform policies and terms of service with which all Uber drivers, including Plaintiffs, must comply.

93.     Although Defendants' agreements require drivers to have the appropriate level of training, expertise, and experience to provide transportation services in a professional manner with due skill, care, and diligence; and maintain high standards of professionalism, service, and courtesy, Defendants do not require drivers to have any experience or expertise upon commencing employment.  Defendants provide all such training to its Drivers.

94.     Defendants also require its drivers to "undergo driver and criminal screenings" and "[e]xisting drivers must consent to annual screenings."  (https://www.uber.com/us/en/ride/ (last visited Sept. 3, 2020)).

95.     Defendants' agreements further require its drivers to acknowledge that when a driver rejects or declines a User's ride request, the driver creates a negative experience for those Users' of Uber's app.  Such agreements discourage drivers from declining ride assignments.

96.     Defendants determine which drivers are eligible to provide transportation services on the app and have complete discretion to change the standards.  For example, Defendants direct the types of cars drivers may use on the app and the standards drivers' vehicles must meet.

97.     Once drivers, including Plaintiffs, pass Defendants' initial requirements, they are able to work for Uber for an indefinite period of time.  However, Defendants may shut down or deactivate drivers' ability to use the app or access to the Uber app for a myriad of reasons, such as cancelling too many rides, not maintaining sufficiently high User satisfaction ratings, or taking routes Defendants find inefficient, thus preventing drivers from obtaining and responding to ride requests.

98.     Drivers perform work for Defendants by logging into the Uber app, making themselves available for assignments and visible to customers, which benefits Defendants.  While

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1    logged in, drivers typically receive ride assignments quickly, sometimes receiving a new ride

2    assignment before completing the existing ride.  Once drivers receive an assignment, Defendants

3    allow them approximately 15 seconds to accept the assignment to drive that User to his or her

4    destination.  Drivers who consistently do not accept a ride assignment may be temporarily logged

5    out from Defendants' app.  Defendants have created this control system and have complete

6    discretion to change or eliminate it.

7         99.    Defendants control the dispatch of users to drivers through Defendants' app,

8    thereby controlling which drivers receive which ride requests and when.  As a result, Defendants

9    control a driver's work and pay.

10        100.    Defendants' manner of assigning rides – including the frequency of ride

11   assignment messages, the very short window within which a driver can accept rides, and the

12   threat of termination for failure to accept the vast majority of rides – prevents drivers from

13   engaging in personal activities while logged into the Uber App.

14        101.    Defendants, not drivers, set and collect the fares that users pay for rides, and set

15   the amount of compensation paid to drivers for providing transportation services to users.

16   Defendants also have discretion to increase the "service fee" charged to Drivers during times of

17   high user demand.

18        102.    At Defendants' discretion, drivers' working conditions are constantly changing.

19   According to Uber, "[t]here are over 1,000 experiments running on our platform at any given

20   time."  (Deb, *et al.*, *Under the Hood of Uber's Experimentation Platform* (Aug. 28, 2018),

21   https://eng.uber.com/xp/ (last visited Sept. 2, 2020).)

22        103.    Defendants, in January 2020, began testing a new feature in certain parts of

23   California that allowed drivers transporting Users to or from airports to increase fares in 10%

24   increments, up to five times Defendants' base fare.  However, Users had the ability to reject rides

25   from Drivers charging more than the rate set by Defendants (unlike in the normal system, where

26   Users have no ability to affect the driver assignment process), and Defendants retained control to

27   assign a User pick-up to another driver Defendants deemed to be appropriate.  Thus, this

28   experiment to allow drivers to charge higher fares ensured that control remained with Uber.

CLASS ACTION COMPLAINT
CASE NO. _____

104. Beginning in July 2020, Defendants offered a new feature designed to allow for driver flexibility and access to independent work. This feature, applicable to certain parts of the State, allowed drivers to increase or decrease Uber's set base fares in 10% increments within a range of 50%-150% of the base fare. However, Users continue to have the right to decline rides at above-base rates, and Defendants continue to have complete control over the ride assignment of drivers for user pick-ups. Because Uber retains significant control, this feature is insufficient to satisfy the requirements of prong A.

105. Defendants control drivers' compensation. Defendants have sole discretion to change fares and fare structures at any time. Uber has set driver compensation to generally be the base fare plus a distance factor and/or time factor plus any promotions or surge fees, minus the "service fee" and "booking fee" Defendants charge, tolls, taxes, and ancillary fees. Uber has determined this pay structure, and drivers had no input into it.

106. Defendants also have sole control over invoicing, claim and fare reconciliation, and resolution of complaints that arise from users and drivers, such as driver-user disputes, allegations of driver or user misconduct, driver complaints concerning their compensation for providing transportation services through the Uber app, as well as lost items, cleaning fees, and damaged vehicles.

107. Defendants control the routes drivers take. For example, if users complain to Defendants about a drivers' route, Defendants have the power to adjust the fare paid to the driver, and Defendants do in fact exercise that power.

108. Defendants have complete control over the terms of a ride assignment. When a Driver is available to provide an on-demand ride, the Uber app shows and matches that driver with only one user at a time, regardless of the number of nearby users. Likewise, when a user requests an on-demand ride through the Uber app, the app shows and matches that user with only one driver at a time, regardless of the number of nearby users. Accordingly, Defendants are selectively steering one another through the centralized direction of its app.

109. Defendants' app does not disclose User information about drivers' experience and vehicles, thereby limiting drivers' ability to market and differentiate themselves and increase

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT
CASE NO. _____

their earnings like an independent contractor would.

110.    Defendants track drivers through the app.  Drivers must notify Defendants through the app the status of their ride assignment at every step, including acceptance of the User's ride request, arrival to the User's pick-up location, start of the ride, and end of the ride.  Defendants constantly monitor and control drivers' behavior while drivers are using the app.

111.    Defendants monitor drivers' work hours.  If a driver reaches the twelve-hour driving limit, Defendants log the driver off the app for six hours, preventing the driver from obtaining and responding to ride requests.

112.    To maintain and protect brand recognition, reputation, and value, Defendants have detailed rules for drivers to follow to create a uniform ride experience.  These rules, which Defendants refer to as "suggestions" or "tips," cover matters such as music, vehicle cleanliness, and prohibited conversation topics.

113.    Defendants further monitor and control drivers through the use of a user rating system that Defendants uses to assess the performance of drivers and to make decisions about disciplining or terminating drivers.  The app solicits feedback and prompts users and drivers to rate one another from one to five stars.  If the average rating of a driver falls below a certain threshold set by Defendants, Defendants may suspend or terminate that driver from using the app.

114.    Defendants also direct driver behavior by making use of algorithms where Defendants unilaterally and periodically engage in "surge pricing" to get drivers to drive in certain geographic areas and during times as needed to provide transportation services to users.  Once Defendants have secured a sufficient number of drivers to respond to user needs, Defendants cancel the "surge."

115.    Accordingly, drivers, are not free from the control and direction of Defendants in connection with the performance of their work for Defendants.  Defendants, thus, cannot satisfy factor A of the ABC test.

V.    **CLASS ACTION ALLEGATIONS**

116.    This action is brought and may properly be maintained as a class action pursuant to Code of Civil Procedure section 382.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

34

117.    Plaintiffs Valdez and Castellanos bring this action, on behalf of themselves and a class initially defined as follows:

> All individuals who have registered as drivers with Uber and have used the Uber driver app in the State of California from the date Uber began placing Proposition 22 advertising on the driver app to the present (the "Class").

**A.    The Class Members Are Numerous and Ascertainable.**

118.    The proposed Class is so numerous that it is impracticable to bring them all before the Court.  Plaintiffs estimate that there are 200,000 Class Members in California.  The number and identities of the Class members may be ascertained from Defendants' records and files and may easily be notified about the pendency of this action through individually mailed notice and/or notice by publication.

**B.    There Is a Well-Defined Community of Interest.**

119.    In order to determine if there is a well-defined community of interest such that the question is one of a common or general interest, a court should consider:  (1) whether common questions of law and facts predominate; (2) whether the class representative's claims or defenses are typical of the class; and (3) whether the class representative can adequately represent the class.

**1.    Common Questions of Law and Facts Predominate.**

120.    This action presents questions of law and facts common to the Class, including, but not limited to, the following:

a.    Whether Defendants violated Labor Code sections 1101 and/or 1102;

b.    Whether Defendants violated the unlawful prong of the Unfair Competition Law by violating Labor Code sections 1101 or 1102;

c.    Whether Defendants violated the unfair prong of the Unfair Competition Law;

d.    Whether Defendants violated the fraudulent prong of the Unfair Competition Law by disseminating deceptive information to Class Members and the public regarding Proposition 22;

e.    Whether Plaintiffs and Class members are entitled to declaratory relief; and

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT
CASE NO. _____

f.   Whether Defendants should be enjoined from continuing the unlawful practices alleged herein.

**2.   Plaintiffs' Claims Are Typical of the Class's Claims.**

121.   Plaintiffs' claims are typical of the claims and of the members of the Class because like members of the Class, Plaintiffs were subject to the complained-of practices in violation of California law.

**3.   The Class Representative Can Adequately Represent the Class.**

122.   Plaintiffs will fairly and adequately represent and protect the interests of the Class, because Plaintiffs have no interests that are antagonistic to or that irreconcilably conflict with those of other Class members.  Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation of employment claims.

**C.   A Class Action Is Superior to All Other Available Methods for the Fair and Efficient Adjudication of Plaintiffs' and Class Members' Claims**

123.   A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiffs' and Class members' claims.  A class action is superior to preserve Class members' claims who would otherwise forego litigation given the burden and expense of individual prosecution of their claims, in comparison to the amount of damages or other harms suffered by each individual Class member.  Individualized litigation would burden the courts, would increase the delay and expense to all parties and the Court, and would produce the potential for inconsistent or contradictory judgments and would establish incompatible standards of conduct for Defendants.  The individual prosecution of separate actions would create a risk of adjudications that may be dispositive of the interests of other Class members not parties to the adjudications, or that may substantially impair or impede their ability to protect their interests.  Further, final public injunctive relief is appropriate against Defendants with respect to members of a Class as a whole, as opposed to individual injunctions.  Certification of a class action to resolve these disputes will reduce the possibility of repetitious litigation involving thousands of Class members and allow supervision by a single court.

///

1

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

**FIRST CAUSE OF ACTION**

**(Violation of Labor Code section 1101)**

**(By Plaintiffs individually and on behalf of the Proposed Class)**

124.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.  Plaintiffs bring this claim individually and on behalf of the proposed Class.

125.     Labor Code section 1101 prohibits employers from making, adopting, or enforcing any rule, regulation, or policy that forbids or prevents employees from engaging or participating in politics, or controls or directs, or tending to control or direct the political activities or affiliations of employees.

126.     Sections 1101 and 1102 protect "the fundamental right of employees in general to engage in political activity without interference by employers."  (*Gay Law Students Assn.*, 24 Cal.3d at 487 (quoting *Fort v. Civil Service Commission* (1964) 61 Cal.2d 331, 335).)

127.     There is a private right of action for an employer's violation of Labor Code section 1101.  (Lab. Code, § 1105; *Lockheed Aircraft Corp. v. Superior Court of Los Angeles County* (1946) 28 Cal.2d 481, 486; *Gay Law Students Assn.*, 24 Cal.3d at 488-89.)

128.     By the conduct alleged herein, Uber has made, adopted, and enforced a policy, applicable to all of its drivers in the State of California, that controls or directs, or tends to control or direct the political activities of those drivers with respect to Proposition 22.

129.     By its false and misleading statements, its solicitations of support for Proposition 22, and its solicitation of survey responses and written and videotaped messages of support for Proposition 22, which Uber monitors and can reward or punish as it sees fit through favorable or adverse work assignments, Uber has interfered with its drivers' right to freely engage or refrain from engaging in political activity pertaining to their support, opposition, or neutrality concerning Proposition 22.

///

///

///

CLASS ACTION COMPLAINT

CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

**SECOND CAUSE OF ACTION**

**(Violation of Labor Code section 1102)**

**(By Plaintiffs individually and on behalf of the Proposed Class)**

130.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.  Plaintiffs bring this claim individually and on behalf of the proposed Class.

131.     Labor Code section 1102 prohibits employers from using the of threat of discharge or loss of employment to coerce or influence or attempt to coerce or influence its employees to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.

132.     Sections 1101 and 1102 protect "the fundamental right of employees in general to engage in political activity without interference by employers."  (*Gay Law Students Assn.*, 24 Cal.3d at 487 (quoting *Fort*, 61 Cal.2d at 335).)

133.     There is a private right of action for an employer's violation of Labor Code section 1102.  (Lab. Code, § 1105; *Lockheed Aircraft Corp.*, 28 Cal.2d at 486; *Gay Law Students Assn.*, 24 Cal.3d at 488-89.)

134.     By the conduct alleged herein, Uber has used the of threat of discharge and loss of employment to coerce and influence and to attempt to coerce and influence its driver employees to adopt or follow Uber's preferred political stance regarding Proposition 22 and refrain from adopting or following any negative position regarding Proposition 22.

135.     By threatening its California driver employees that it will cease operations in California unless Proposition 22 passes, Uber has used the threat of discharge and loss of employment to coerce or influence its drivers to support Proposition 22.

136.     By threatening its California driver employees that it will cease operations in California unless Proposition 22 passes, Uber has used the threat of discharge and loss of employment to coerce or influence its drivers to provide material support, including public statements and survey results, to Uber in efforts to obtain enactment of Proposition 22.

///

38

CLASS ACTION COMPLAINT

CASE NO. _____

137.    By threatening its California driver employees that they will be terminated and forced to re-apply for jobs unless Proposition 22 passes, and that only 30% of them will be re-hired, Uber has used the threat of discharge and loss of employment to coerce or influence its drivers to support Proposition 22.

138.    By threatening its California driver employees that they will be terminated and forced to re-apply for jobs unless Proposition 22 passes, and that only 30% of them will be re-hired, Uber has used the threat of discharge and loss of employment to coerce or influence its drivers to provide material support, including public statements and survey results, to Uber in its efforts to obtain enactment of Proposition 22.

## NOTICE OF THIRD CAUSE OF ACTION

**(The Private Attorneys General Act ("PAGA"), Labor Code section 2698 *et seq*.)**

**(By Plaintiffs Valdez and Castellanos individually and on behalf of the LWDA and all aggrieved employees)**

139.    Plaintiffs Valdez and Castellanos hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.  Plaintiffs bring this claim individually and on behalf of the proposed Class.

140.    Plaintiffs Valdez and Castellanos are in the process of satisfying the administrative exhaustion requirements of PAGA.  Upon completion of that process, Plaintiffs will seek leave to amend the complaint to seek civil penalties on behalf of themselves and all other aggrieved employees, should the LWDA decline to prosecute these claims.

141.    The amended cause of action will be based on Uber's violation of Labor Code sections 1101 and 1102 by (1) making, adopting, and/or enforcing rules, regulations, and/or policies preventing Plaintiffs and the proposed class from engaging or participating in politics and controlling, directing, or tending to control or direct the political activities or affiliations of Plaintiffs and the proposed class and (2) coercing, influencing, and/or attempting to coerce or influence Plaintiffs and the proposed class through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following particular courses or lines of political action or political activity.  Specifically, Uber has publicly threatened mass layoffs of

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT

CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1    its drivers if Proposition 22 fails to pass in the upcoming November 2020 election, and Uber has

2    simultaneously applied enormous pressure on its drivers to vote for Proposition 22 in the

3    upcoming election.

4    **FOURTH CAUSE OF ACTION**

5    **(Violation of the Unfair Competition Law ("UCL"),**

6    **Business and Professions Code section 17200 *et seq*.)**

7    **(By Plaintiffs Worksafe and Chinese Progressive Association)**

8    142.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate

9    them as if fully set forth herein.  Plaintiffs bring this claim on their own behalf and on behalf of

10   the general public.

11   143.    Plaintiffs Worksafe and CPA have suffered economic injury as a result of Uber's

12   conduct as alleged herein, because they have been required to devote the time and resources of

13   their paid staff members to respond to Uber's tactics to spread misinformation about the drivers'

14   rights as a means of coercing and influencing the drivers' political activity.

15   144.    For the reasons alleged in the preceding paragraphs, Uber's challenged practices

16   are unlawful, unfair, and fraudulent within the meaning of the UCL.

17   145.    Uber's practices as alleged herein violate Labor Code sections 1101 and 1102

18   because by sending false and misleading messages to its captive audience drivers, and by

19   threatening those drivers with job loss and other adverse employment consequences actions if

20   they do not provide material support to Uber's Yes on Prop 22 campaign.  Uber controls, directs,

21   or tends to control or direct the workers' political activities or affiliations, and coerces, influences

22   and attempt to coerce or influence the drivers to adopt or follow or refrain from adopting or

23   following a particular course or line of political action or activity.

24   146.    Uber's practices as alleged herein are unfair and anti-competitive.  Those practices

25   deprive drivers of their rights under California law to exercise free political choice and to refrain

26   from supporting their employer's preferred political outcomes.  Those practices also harm Uber's

27   law-abiding competitors, including transportation companies like taxi companies and others that

28   do not have, or exercise, the ability to coerce captive audience employees to support their self-

CLASS ACTION COMPLAINT
CASE NO. _____

interested political agendas.  In addition, Uber's practices constitute unfair business practices in violation of the UCL because, among other things, they are immoral, unethical, oppressive, unscrupulous, or substantially injurious to the drivers, and/or any utility of such practices is outweighed by the harm caused to the drivers.  Uber's practices violate the legislative policies of the underlying statute alleged herein: namely, protecting people from unfair business practices and preventing persons from being injured through misleading representations and through interference with their political freedom and autonomy.  Uber's practices caused substantial injury to Plaintiffs and are not outweighed by any benefits, and Plaintiffs could not have reasonably avoided these injuries.

147.    Uber has and continues to violate the UCL through its ongoing business practices as described herein.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court order the following relief and enter judgment against Defendants as follows:

A.    On behalf of Plaintiffs and the proposed Class, a declaration that Uber's interference with drivers' political freedoms violates the applicable Labor Code provisions alleged herein;

B.    On behalf of Plaintiffs and the proposed Class, a temporary, preliminary, and permanent injunction enjoining Uber from continuing to engage in the violations of Labor Code sections 1101 and 1102 as alleged herein, including by:

1.    Enjoining Uber from using, now or in the future, any information gained as a result of monitoring its driver employees' responses to its Proposition 22 messaging as a basis of favoring or disfavoring such employees with respect to employment, work assignments, or other work related benefits or detriments;

2.    Enjoining Uber between now and the upcoming election from continuing to place false or misleading statements about the consequences of Proposition 22 passing or failing on its driver apps;

3.    Requiring Uber to inform each California driver that the driver has the

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

right under California law not to be subjected to any employer policy that forbids or prevents that driver from engaging or participating in politics, or that controls or directs or tends to control or direct the political activities or affiliations of such driver, or to be threatened with the loss of employment in an attempt to coerce or influence the driver to adopt or refrain from adopting any political activity;

        4.      Requiring Uber to inform each California driver that the driver has the right under California law to vote for or against Proposition 22 or not to vote at all, and to provide or refrain from providing any support to any party advocating for or against Proposition 22, and that Uber will not monitor or otherwise use any information it may have obtained about any driver's support or non-support for Proposition 22 in favor or against that driver with respect to any work-related matter.

C.      On behalf of Plaintiffs and the proposed Class, a declaration that Uber's interference with drivers' political freedoms is unlawful, unfair, and fraudulent in violation of the UCL;

D.      An award of reasonable attorneys' fees and costs pursuant to Civil Code section 1021.5 and as otherwise allowed by law; and

E.      Such other and further relief as may be available as part of the statutory claims asserted herein or otherwise as may be deemed necessary or appropriate for any of the claims asserted.

DATED:  October 22, 2020          Respectfully submitted,

                        RUDY, EXELROD, ZIEFF & LOWE, LLP

By: _____
    DAVID A. LOWE
    JOHN T. MULLAN
    MICHELLE G. LEE
    MEGHAN F. LOISEL
    WILLIAM P. McELHINNY
    *Attorneys for Plaintiffs*
    *Benjamin Valdez, Hector Castellanos,*
    *Worksafe, and Chinese Progressive Association*

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1

**DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury on all causes of action and/or issues so triable.

3

DATED:  October 22, 2020                          Respectfully submitted,

4

RUDY, EXELROD, ZIEFF & LOWE, LLP

5

6

By: _____

7

DAVID A. LOWE

8

JOHN T. MULLAN
MICHELLE G. LEE

9

MEGHAN F. LOISEL
WILLIAM P. McELHINNY

10

*Attorneys for Plaintiffs*

11

*Benjamin Valdez, Hector Castellanos,*
*Worksafe, and Chinese Progressive Association*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

CLASS ACTION COMPLAINT

CASE NO. _____

# EXHIBIT A











2:43

70%

←

# Saving jobs and fighting for flexibility, together

Drivers and delivery people are voting yes because Prop 22 is progress. Prop 22 would secure your access to flexible work, while delivering benefits like:



### A minimum earnings guarantee

Earn at least 120% of minimum wage plus $0.30 per mile for expenses, with no upper limit on how much you can earn.

Learn more ›



### Healthcare benefits

Receive a stipend of at least $300* a month (depending on how much you drive) toward health insurance or medical care.

Learn more ›



### Occupational accident insurance

Cover medical bills if you're injured while driving or delivering.

Here is a side-by-side comparison of what a yes or no vote would likely mean for your experience using Uber:

|||   ○   |   ‹   |



or no vote would likely mean for your experience using Uber:

| Driving experience with Uber | Yes on Prop 22 | No on Prop 22 |
|---|---|---|
| Work when and where you want | ✓ | ✗ |
| No upper limit on what you can earn | ✓ | ✗ |
| Work using multiple apps | ✓ | ✗ |
| Must accept all trips | ✗ | ✓ |
| Limited number of drivers allowed on the platform (only 20-30% of current drivers) | ✗ | ✓ |

6



2:43 ⊙

**Make your voice heard by voting and talking to your customers.**
Together, we can ensure that Prop 22 passes.

## Are you registered to vote?

October 19 is the final deadline to register online to vote. Make your voice heard!

Click here to check your voter registration status.

Click here to register to vote. Your registration must be electronically submitted or postmarked by October 19.

Eligible citizens who need to register or re-register to vote after October 19 can click here for a list of early voting locations where you can complete the same-day voter registration process.

**Learn more**

*Based on yes on 22 estimates for 2019. Covered California will determine the 2021 amount.

Paid for by →



2:44

69%

←





# Yes for safer communities

This week, Mothers Against Drunk Driving (MADD) came out in support of Prop 22, urging the public to vote yes because research shows that cities in California with ridesharing have seen double digit declines in DUI arrests.

MADD said in its endorsement that *"We know that access to ridesharing helps reduce drunk and drug-impaired driving, keeping our roads and communities safe. Simply put: voting yes on Prop 22 will save lives."*

We encourage you to read the full open letter.

**It's drivers like you who have made this positive impact on your communities possible. Thank you.**

MADD joins many other community groups— like the California NAACP and the California Small Business Association—that are standing with you and supporting yes on Prop 22.

Make your voice heard and make sure your vote is counted. If you still need to register to vote,

III            ◯            ‹



MADD said in its endorsement that *"We know that access to ridesharing helps reduce drunk and drug-impaired driving, keeping our roads and communities safe. Simply put: voting yes on Prop 22 will save lives."*

We encourage you to read the full open letter.

**It's drivers like you who have made this positive impact on your communities possible. Thank you.**

MADD joins many other community groups—like the California NAACP and the California Small Business Association–that are standing with you and supporting yes on Prop 22.

Make your voice heard and make sure your vote is counted. If you still need to register to vote, click here.

If you're voting early, you can now mail in or drop off your ballot. Or, you can vote in person on November 3.

Prop 22 is progress. Together, we can make it a reality.

**Register now**

Paid for by

2:44 🖼 📷     ✳ 📶 ◉ 🔋 📶 69% 🔋

←

# How a yes or no vote on Prop 22 would affect you





72% of drivers and delivery people have already said they're supporting Prop 22. By joining them, you'll help create a better, more secure future for flexible work by delivering benefits that include:

- **A minimum earnings guarantee**
  Earn at least 120% of minimum wage plus $0.30 per mile for expenses, with no upper limit on how much you can earn.
- **Healthcare benefits**
  Receive a stipend of at least $300* a month (depending on how much you drive) toward health insurance or medical care.
- **Occupational accident insurance**
  Cover medical bills if you're injured while driving or delivering.

This is what's at stake with Prop 22, and it's why we're fighting so hard to make it a reality.



III      ◯      ‹



of what a yes vs no vote would likely mean for your experience using the app.

| Driving experience with Uber | Yes on Prop 22 | No on Prop 22 |
|---|---|---|
| Work when and where you want | ✓ | ✗ |
| No upper limit on what you can earn | ✓ | ✗ |
| Work using multiple apps | ✓ | ✗ |
| Must accept all trips | ✗ | ✓ |
| Limited number of drivers allowed on the platform (only 20-30% current drivers) | ✗ | ✓ |

12



2:44

**Inbox**   Help

**Extra Uber Pro points, from us to you**
2 weeks ago

**Refill your free health and safety supplies**
2 weeks ago

**Prop 22 and you**
2 weeks ago

**Choose your Quest for 9/28 — 10/2**
3 weeks ago

**Your health and safety supplies are on the way**
3 weeks ago

**Prop 22 vs. employment**
3 weeks ago

**Mask Verification for riders**
3 weeks ago

13



Hi Benjamin,

**72% of drivers and delivery people have already said they're voting yes on Prop 22.** Together, we can secure the future of flexible work. That's why we're fighting so hard to pass Prop 22.

Prop 22 would protect the flexibility that drivers and delivery people like you value while also delivering new benefits you deserve, including:

- **An earnings guarantee**
  Earn at least 120% of minimum wage plus $0.30 per mile for expenses, with no upper limit on how much you can earn.
- **Healthcare benefits**
  Receive a stipend of at least $300* a month (depending on how much you drive) toward health insurance or medical care.
- **Occupational accident insurance**
  Cover medical bills if you're injured while driving or delivering.

It's also important to understand how a no vote on Prop 22 could drastically impact the driver experience. Below, you can see a side-by-side comparison of what these 2 models would likely mean for your experience using the app.

| Driving experience with | Yes on Prop 22 | No on Prop 22 |
|---|---|---|

14



# What if Prop 22 doesn't pass?

See how app-based work might change in California.

Paid for by



1 of 6



# Driving jobs would be limited

We estimate only 3 out of 10 drivers would be hired as higher prices and longer wait times reduce demand for rides.

   2 of 6   



# Flexibility would be limited, too

As an employee, you would likely:

* Work a minimum number of hours
* Take only limited days off
* Be required to work on specific days

 3 of 6 

17



## Shifts would be scheduled

Right now you can go online anytime you want, but with scheduled shifts work would be limited to certain times of the day or week.

 4 of 6 



## Every trip would be accepted

Trips would be accepted automatically, and you'd have to work in an assigned area.

 5 of 6 





## Drivers deserve better

Your support is critical. Make your voice heard by talking to your customers. Vote yes on Prop 22.



6 of 6





**Hi Benjamin,**

Your health and well-being matter to us, and we believe that access to healthcare is a human right.

While many drivers currently have access to healthcare, too many don't. And because healthcare has historically been tied to full-time employment, it can be difficult to get covered if you want to work independently.

We want to ensure that choosing flexible work doesn't mean forgoing healthcare coverage. That's why we're fighting for Yes on Prop 22.

## Here's how it works:

- **If you drive or deliver an average of 15 hours a week**, you're eligible for at least $150* a month for healthcare and medical costs

- **If you drive or deliver an average of 25 hours a week**, you're eligible for the full contribution of $300 a month

- Your weekly average consists of en-route and on-trip time over a calendar quarter

You'd receive this stipend from every rideshare or food delivery app you use, as long as you meet the same hourly thresholds.

21



You'd receive this stipend from every rideshare or food delivery app you use, as long as you meet the same hourly thresholds.

## Vote Yes on Prop 22

In addition to healthcare benefits, Prop 22 would give you access to **occupational accident insurance** to cover medical bills if you're injured while driving or delivering.

If Californians vote Yes on Prop 22, Uber would be able to extend these meaningful benefits to you and tens of thousands of drivers and delivery people like you.

Learn more >

## We want to hear from you

Let us know what Prop 22—and the benefits and protections it provides—means to you. Make your voice heard by sharing your story with us.

Record your story >

*Based on Yes on 22 estimates for 2019. Covered California will determine the 2021 amount.

Paid for by Uber Technologies, Inc.

22





# Sharing your stories - submission form

We want to hear your story and thoughts on Prop 22, submit your video by following the steps below. If you'd like to learn more about the Prop 22 visit the website:
https://prop22facts.com/join/?source=uber

* Required

Film a 30-60 second video of yourself answering the questions listed below. Hold your phone up to eye level, use the front-facing camera on your phone, and try and hold the phone as steady as possible. Your face should be centered and should fill the majority of the frame, see the photo below.



2:46 ☑ ☐       ✳ ⚡ 📶 4G ⚡ ▂▂▂ 68%▮

Record one, continuous video of yourself answering the questions below, as well as anything else you'd like to share.

○ Introduce yourself, what's your name? Example: Hi, my name is...

○ What city do you driver or deliver in? Example: I drive in...

○ Why is, or isn't, flexibility important to you? Example: Flexibility is important to me because...

○ Do you support Prop 22? Example: I support Prop 22

○ Why do you support or not support Prop 22? Example: I support Prop 22 because...

○ Option 6

---

What is your name? *

Your answer

---

▯ What is your email address? *



# We believe a better way to work is possible

Apps like Uber are great for finding flexible work that can help you make ends meet. But it can sometimes be hard to know exactly how much you will make by driving or delivering food.

That's why we're fighting for **Prop 22**: it will give you an earnings guarantee so that you can always know the minimum you will earn for your time.

Prop 22's earnings guarantee includes:

- **Minimum earnings:** If you earn less than the guarantee (120% of minimum wage over 2 weeks) Uber will pay you the difference.
- **Expense reimbursement:** This earnings guarantee includes $0.30 per mile to account for your expenses, such as gas and vehicle wear-and-tear.
- **No upper limit:** The minimum is just that— a minimum. There's no upper limit to how much you can earn on the app.
- **Tips are on top:** As always, you keep 100% of the tips you earn for the service you provide. And these tips are not included in how the minimum guarantee is calculated.

**How it would work:**
The guarantee is calculated every 2 weeks:

25



## How it would work:

The guarantee is calculated every 2 weeks:

$$(\$0.30 \times \text{miles*}) + (1.2 \times \$\text{minimum wage} \times \text{hours*})$$

*en route to pickup and on-trip only

For example, over 2 weeks, a driver in Los Angeles:

- Is en-route to pickups and on-trip for 500 miles
- For a total of en-route and on-trip time of 20 hours
- The minimum wage in Los Angeles is $13

In this case, the driver would have a total earnings guarantee of $462.

- $0.30 x 500 miles = $150
- 1.2 x $13 x 20 hours = $312
- $150 + $312 = **$462 total minimum earning guarantee**

So, in this example, if the driver makes less than $462 ($23.10/hour in this case), Uber would pay the driver the difference.

**In addition to this earnings guarantee, Prop 22 would also give you access to new benefits, like healthcare, and new protections against discrimination.**

To make this a reality, we need to update our



# Rideshare in California is at risk

We may have to temporarily suspend ridesharing starting this week.

We know you rely on Uber to earn and hope that we're able to continue operating.

We remain committed to getting you access to new benefits and protections with Prop 22.

Learn more







# Prop 22: What's at stake?

Compare the likely driving experience with and without Prop 22.

| Driving experience with Uber | Yes on Prop 22 | No on Prop 22 |
|---|---|---|
| Work when and where you want | ✓ | ✗ |
| No upper limit on what you can earn | ✓ | ✗ |
| Work using multiple apps | ✓ | ✗ |

30

4:46 ⚙ ⚕ ⛶ ▦      ☀ ◀ ♀ ⚡ ᴴᴳ ᴬ 51%🔋

✕

Paid for by Uber Technologies, Inc.

Drivers deserve better

See a comparison of work with and without Prop 22.



What if Prop 22 doesn't pass?

See how app-based work might change in California.



Making drivers' voices heard

Hear drivers' personal stories about why Prop 22 matters to them.



Prop 22 healthcare benefits

Receive a stipend that you can put toward insurance or medical care.



Prop 22 earnings guarantee

A yes vote will bring new benefits, such as guaranteed earnings.



31



# Prop 22 healthcare benefits

If Prop 22 passes, you can receive a stipend of at least $300* a month, paid by Uber, to put toward health insurance or medical care.



**Eligible after 15 hours**
You're eligible for at least $150 a month if you work at least 15 hours a week on average



**Full stipend after 25 hours**
If you work 25 hours or more a week on average, you'll get the full $300 a month



# Prop 22 earnings guarantee

Vote yes on Prop 22, which includes an earnings guarantee that's at least 120% of your city's minimum wage.



### Always know what you'll earn

If you earn less than the guarantee over two weeks, Uber will pay you the difference.



### Cover your expenses

The guarantee includes $0.30 per mile toward expenses like gas and vehicle wear-and-tear.

33




# Prop 22: A better way to work

Choosing flexible work shouldn't mean forgoing basic benefits. That's why we're fighting for Yes on Prop 22.



### Minimum earnings guarantee

Earn at least 120% of minimum wage plus $0.30 per mile for expenses, with no upper limit on how much you can earn.



### Healthcare benefits

Receive a stipend of at least $300* a month (depending on how much you drive) toward health insurance or medical care.



### Occupational accident insurance

Cover medical bills if you're injured while driving or delivering

34

7:02    100%

# Do you support Prop 22?

Let us know where you stand. We'd like to let your customers know if you support Prop 22.

Yes, I support Prop 22

No, I don't support Prop 22

I'm not sure

**Next**

35

# Let us know if you have a partition

Hi Benjamin,

**Do you have a divider / partition installed in your vehicle? Please let us know by clicking below.**

We are always making updates to the information we show riders about the steps drivers are taking. Your feedback will be used to inform those efforts.

Your feedback is important to us and we would appreciate hearing from you.

Thank you!

Let us know

Your participation in this survey is entirely voluntary. By filling out the survey you consent to have Uber use your response in identifiable form for the purpose of this research. Please find our privacy policy here:

36



# What if Prop 22 doesn't pass?

See how app-based work might change in California.

Paid for by Uber Technologies, Inc

1 of 6





# If Prop 22 fails to pass, riders and drivers will be affected

Your ride prices and wait times are likely to substantially increase while most drivers will lose their incomes

Yes on Prop 22

Paid for by Uber Technologies, Inc.

**CONTINUE TO RIDE**

38





# Prop 22 is progress

Prop 22 will provide guaranteed earnings and a healthcare stipend.

Paid for by Uber Technologies, Inc.

**GET THE FACTS**

**OK**



Hi Benjamin,

Over the past few weeks, we've been highlighting some of the key benefits of Prop 22, like a minimum earnings guarantee, healthcare contributions, and occupational accident insurance.

We've also been listening. We asked drivers to tell us what Prop 22 would mean to them, and we've heard why setting a new standard for flexible work is so important. That's what we're fighting for.

Now we want to share one of the stories we've received, so you can hear what other drivers are saying.

**Click here to watch**

**We want to hear from you, too.**

Send us a video and share your story about what the benefits of Prop 22 would mean for you. Together, we can make our voices heard.

Record your story ›

Let riders know you support Prop 22 ›

A growing number of voices are joining drivers in support of Prop 22.

This weekend, two major newspaper editorial boards endorsed Prop 22:

The San Francisco Chronicle Editorial Board urged Californians to vote yes on Prop 22, arguing it best strikes a balance that would "allow the ride-hail and delivery companies to keep rolling in a way that would increase driver pay and protections while acknowledging that their business does not fit within the realm of traditional employment."

The editorial boards of the San Jose Mercury News and East Bay Times also backed Prop 22 because it "would guarantee workers at least 120% of minimum wage for the hours they're driving in addition to their tips, payments for full health insurance coverage for those who work full-time and proportional payment for those who work less, disability insurance and compensation for mileage expenses."

The Chronicle and Mercury News join groups like the California NAACP, California Hispanic Chamber of Commerce, Si Se Puede, the National Organization of Women (NOW) and 100 community advocates in supporting Prop 22.

Yes on Prop 22 ›

Paid for by Uber Technologies, Inc.



# Rideshare in California is at risk

August 18 / US





We may have to temporarily suspend ridesharing in California starting this week.

The California Attorney General obtained a court order that requires rideshare companies to hire drivers as employees—immediately—or else shut

41



2:47

← Rideshare in California is at...

Uber Blog

Sign up

Start ordering with Uber Eats
Install the app

We may have to temporarily suspend
ridesharing in California starting this week.

The California Attorney General obtained a court
order that requires rideshare companies to hire
drivers as employees—immediately—or else shut
down.

We've appealed this decision, but if we are not
successful in our appeal, we will need to
temporarily shut down by Thursday night.

We know that riders rely on Uber to get around,
and drivers rely on the Uber app to earn income.
We wanted to let you know that this is a
possibility, so you can plan accordingly.

We remain committed to helping drivers get
access to new benefits and protections without
compromising the flexibility they have today via
Proposition 22, which is on the ballot this
November. You can learn more about Prop 22
here.

42

2:47 ⌷ ⌶ ⁝      ⁑ ◢ ◉ ⬡ ⁴ᴳ ◢◢◢ 67% ▮

← **Rideshare in California is at…**

**Uber** Blog          ◉  🔍  ( **Sign up** )  ≡

| **Uber** | **Start ordering with Uber Eats** | ✕ |
| **Eats** | Install the app | |

possibility, so you can plan accordingly.

We remain committed to helping drivers get
access to new benefits and protections without
compromising the flexibility they have today via
Proposition 22, which is on the ballot this
November. You can learn more about Prop 22
here.

We'll keep you updated this week as we learn
more.

Paid for by Uber Technologies, Inc.

——

Posted by Uber

Category:

Share this post

f    🐦    in    ✉    🔗

——

|||        ◯        ‹

43



## You're offline

◆ Help

# Prop 22: Get the facts

See why yes on Prop 22 is a better way to work in California.



12:45

## Trip Planner

Drivers talk about why Prop 22 would make a difference.



◆ Help

# Take our online poll

Let us know where you stand on Prop 22.

  

Paid for by Uber Technologies, Inc.

OFFLINE

45

